## CIRCUIT COURT OF ALBEMARLE COUNTY

Blanka A. Rosenstiel

    v.

Harry Fair

April 3, 1991

Case No. (Law) 4013

By JUDGE JAY T. SWETT

This case is before the court on the application of defendant, Harry Fair, to vacate an arbitration award rendered in favor of plaintiff, Blanka Rosenstiel, and on Rosenstiel's motion to confirm the arbitration award. The facts are as follows.

In October, 1987, Rosenstiel leased to Fair approximately 750 acres of Blandemar Farm, located in Albemarle County. The term of the lease was three years. Various disputes arose between them, and Rosenstiel filed suit against Fair for breach of the lease. Fair filed a plea of arbitration and sought an order to compel arbitration of all disputes pursuant to an arbitration clause in the lease. This court granted Fair's request and referred the parties to arbitration. The lease required the parties to refer all disputes relative to the lease to an arbitration committee composed of one member selected by each party and a third member selected by the other two. Rosenstiel chose Mr. Samuel Nakasian to be an arbitrator. Fair chose Mr. Ronald Woodson. Messrs. Nakasian and Woodson chose Mr. Charles Echols to be the third arbitrator. The parties then prepared a decree of reference in which Rosenstiel identified twenty-two claims against Fair, and Fair identified six counterclaims against Rosenstiel.

The arbitrators heard testimony for four days. The transcript of the testimony was over 800 pages. The panel received over seventy exhibits into evidence. During the proceedings, Rosenstiel represented herself. Fair, an attorney, entered an appearance on his own behalf and was also represented by Fred G. Wood, Esq. On August 28, 1990, the arbitrators, in a unanimous decision, upheld fourteen of Rosenstiel's claims and awarded her $80,811.00. The arbitrators upheld one of Fair's counterclaims and awarded him $1,740.00. On September 17, 1990, Rosenstiel filed a motion to confirm the arbitration award pursuant to the Virginia Uniform Arbitration Act, § 8.01-581.09.

While the application to confirm the award was pending, Fair filed deposition notices and subpoena requests for the arbitrators. Fair also requested subpoenas duces tecum be served on each arbitrator commanding the arbitrators to bring to the depositions (1) their tax returns for the prior five years; (2) bank statements or other documents that would reflect their income over the last three years; and (3) contracts, letters, bank statements, or other documents that would relate any of the arbitrators to the other or to Rosenstiel. Motions to quash the deposition notices, the subpoenas duces tecum and motions for a protective order were filed by Rosenstiel and by each of the arbitrators. This court entered an order staying the matter until a hearing could be scheduled on the motions to quash.

On November 14, 1990, Rosenstiel and Fair appeared by counsel. Also present were the three arbitrators. In support of his argument to depose the three arbitrators and examine the various records requested in the subpoenas duces tecum, Fair argued that the discovery was necessary in order for him to file an application to vacate the award pursuant to § 8.01-581.010 of the Virginia Arbitration Act. Fair argued that the discovery was not prohibited by the Virginia Rules of Civil Procedure and was necessary in order for him to properly present and support the various grounds for his yet-to-be-filed application to vacate the award. During the hearing, Fair argued that his application to vacate the award would be directed primarily at the conduct of arbitrator Nakasian. After hearing argument, the various motions to quash the deposition notices and the subpoenas were granted. I did so after finding that

Fair had not presented sufficient grounds to require the arbitrators to undergo depositions or to require them to produce confidential financial information.

Thereafter, Fair filed a timely application to vacate the arbitration award. On December 11, 1990, a hearing was held on Rosenstiel's application to confirm the award and on Fair's application to vacate the award. Counsel then filed briefs. Having considered the evidence, argument of counsel, and the authorities submitted, I make the following findings and rulings.

In Virginia, it has long been the case that "[b]oards of arbitration, which are courts of the parties' own selection, are favored by the law, and every fair presumption is made in order to sustain their award." *Martin v. Winston*, 181 Va. 94, 106 (1943) (quoting *Coons v. Coons*, 95 Va. 434 at 438 (1897)). Parties who choose arbitration as a method of dispute resolution so do precisely to avoid costly and lengthy courtroom litigation. Thus, Virginia courts construe arbitration awards liberally, so as to uphold them where possible and indulge every presumption in their favor. *Howerin Residential Sales v. Century Realty*, 235 Va. 174, 179 (1988); *see also, Sydnor Co. v. County School Board*, 182 Va. 156 (1943); *Equitable Ins. Co. v. Stieffens*, 154 Va. 281, 289 (1930); *Coons v. Coons*, 95 Va. 434, 438 (1897). This being the case, a court may not inquire lightly into the validity of an arbitration award. Instead, a court's inquiry is limited to the grounds set forth in the arbitration act, Virginia Code § 8.01-581.010. The act codifies as grounds for vacatur the few which have been historically available under Virginia law, such as misconduct or partiality on the part of the arbitrators, Virginia Code § 8.01-581.010(1) & (2); *see also, Shermer v. Beale*, 1 Va. (1 Wash.) 11 (1791), or the rendering of an award in excess of their authority, Virginia Code Section 8.01-581.010(3), *see also, Sydnor, supra*.

The burden in such cases rests on the attacking party "to prove clearly and unequivocally the misconduct of the arbitrators." *Howerin*, 235 Va. at 179 (citing *Equitable Ins. Co.*, 154 Va. at 290). Moreover, a party seeking vacatur confronts three substantial obstacles: "(a) the conclusive and binding effect of the award, (b) the presumption in its favor, and (c) . . . the burden of proving convincingly the misconduct of the arbitrators."

*Id.* With these principles in mind, I now turn to the case at bar.

Mr. Fair alleges five grounds in support of his Application to Vacate. In his original application, Fair raised nine grounds to vacate the award. The court will limit its rulings to the five raised in his legal memorandum and assume that the others have been abandoned.

The first is that Nakasian, Rosenstiel's choice as arbitrator, had prior discussions with Rosenstiel's attorney, Lindsay Barnes, which Nakasian should have disclosed prior to the arbitration proceeding. The second is that Nakasian had *ex parte* contacts with Rosenstiel and two of her witnesses while the arbitration was pending. Third, Fair alleges that Nakasian's conduct during the arbitration manifested "evident partiality" on behalf of Rosenstiel. Fourth, Fair alleges that Rosenstiel stated in a social gathering while the arbitration was under way that one of the arbitrators would vote in her favor. Finally, Fair alleges that the arbitrators exceeded their authority, as defined by the decree of reference, by awarding lost profits damages to Rosenstiel. For the reasons set forth below, the court finds that none of the grounds asserted is sufficient to support an application to vacate.

Fair's first ground for vacatur relates to Nakasian's undisclosed contact with Mr. Barnes, counsel for Rosenstiel. Mr. Barnes was the attorney who filed the original suit on behalf of Rosenstiel. However, he did not represent her in the arbitration proceeding. Rosenstiel represented herself. The matter came to light when Barnes was called as a witness in the arbitration by Rosenstiel. In response to questions by Rosenstiel, Barnes mentioned that Fair had allowed animal carcasses to remain on the farm. Barnes was then asked by Nakasian whether he had actually seen the carcasses. In responding he had not, Barnes referred to a conversation he previously had with Nakasian about the carcasses. Barnes also testified that he knew of them, in part, through his knowledge of a General District Court judgment against Fair for keeping animal carcasses on the premises. *Tr.*, vol. 1, pp. 162-168. Fair argues that, under the Supreme Court's decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968), Nakasian's conduct amounts to evidence partiality and

use of undue means sufficient to require vacatur of the award.

In *Commonwealth Coatings*, the Supreme Court interpreted provisions of the United States Arbitration Act, 9 U.S.C. sect. 2, *et seq.*, which are similar to the provisions of the Virginia Uniform Act. One of three arbitrators in the case failed to disclose "repeated and significant" prior business dealings with one of the parties The business dealings included frequent patronizing of the arbitrator's business and payment to the arbitrator of over $12,000.00 in fees. 393 U.S. at 146. Writing for the plurality, Justice Black stated that even though the petitioner did not charge the arbitrator with actual fraud or bias, the failure of the arbitrator to disclose such dealings that could create even the "impression of possible bias" satisfied the "evident partiality" requirement of the act. *Id.* at 147-150. Justice Black grounded this interpretation in analogous due process concepts, particularly in the criminal context, which the Court as a whole declined to extend to arbitration proceedings. The holding was somewhat qualified by Justice White's concurrence, stating that, "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150.

In the case at bar, there is no evidence of or an allegation of a prior business relationship between Messrs. Nakasian and Barnes. Apparently, they had discussed the issue of the animal carcasses while Mr. Barnes was representing Rosenstiel in earlier dealings with Fair. Fair does not explain how this earlier discussion evidences the existence of a relationship that should have been disclosed prior to the arbitration. It certainly was not on the order of the business relationship present in *Commonwealth Coatings*. Equally important, Nakasian's behavior was not partial. The transcript shows the matter of the carcasses was first mentioned by Barnes in response to a question from Rosenstiel. Nakasian's questions went to whether Barnes had actually seen the carcasses, and Barnes said he had not. Thus, even assuming the matter of the carcasses was relevant, it was not disclosed in response to questions by Nakasian. The court does not

see how a prior conversation between Barnes and Nakasian rises to the level of the type of conduct or relationship criticized in *Commonwealth v. Coatings*. This is not a sufficient ground to set aside the award.

The second ground for vacatur concerns Nakasian's *ex parte* contacts with Rosenstiel and two of her witnesses, Fred Scott and Paul Jasiurkowski. Rosenstiel had asked both to appear as witnesses at the arbitration proceeding. Both declined her request. She then contacted arbitrators Echols and Nakasian and asked if they would compel the witnesses to appear and testify. Rather than use the subpoena power which the arbitrators possessed, Nakasian telephoned both and asked them to appear. Nakasian explained to both the reason they were being asked to testify. Scott possessed some knowledge of Fair's care of the farm. Mr. Jasiurkowski had been an employee of Rosenstiel's for twelve years and apparently could testify about the farm's condition prior to Mr. Fair's leasing of it. Both men testified at the arbitration proceeding.

Fair contends that, via these conversations, undue means were used to procure the award, because Nakasian received evidence *ex parte*. Fair argues that Nakasian discussed the expected areas of testimony with the two witnesses and that he knew of the expected areas of testimony. He argues that they must have discussed the merits of Rosenstiel's case and this is evidence that the conversations unduly influenced the award.

Both men testified at the December 11, 1990, hearing. Both indicated that at no time did they discuss the merits of the dispute with Nakasian, nor did Nakasian try in any way to influence their testimony before the panel. This case, does not fit the facts of the cases relied on by Fair, where the arbitrators received evidence *ex parte. See, Goldsberry v. Hohn*, 583 P.2d 1360 (Ariz. 1978); *see also, Hahn v. A. G. Becker Paribas, Inc.*, 518 N.E.2d 218 (Ill. 1987). Nakasian's knowledge of their expected areas of testimony is not akin to knowledge of the testimony itself.

Rosenstiel had a right to compel the testimony of witnesses by subpoena. Once requested by Rosenstiel to secure the appearance of the witnesses, it would have been better for Nakasian or Echols to request subpoenas for their appearance rather than call to ask them to come.

But both men testified that the only purpose of Nakasian's call was to ask them to come. There was no attempt to influence their testimony. Viewing the issue in this context, this is not a ground to set aside the award.

Perhaps the most serious ground proffered by Fair for vacatur in his assertion that Nakasian's conduct during the arbitration betrayed evidence partiality and the use of undue means to procure the award. In analyzing this issue, the court does not decide the issue of whether the parties intended Nakasian to be a neutral arbitrator but assumes *arguendo* that they did.

Fair points to many instances within the record which he contends show Nakasian's unmistakable bias in favor of Rosenstiel. After reading the transcript, the court does not agree. It is clear that there were a number of strong-willed personalities present. While one could argue that Nakasian's conduct seemed partial to Rosenstiel and antagonistic to Fair, it is also arguable that on occasions he sought to illuminate an unclear record, or to define precise issues, or to eliminate misunderstandings about what was and was not at issue at a given moment. Rosenstiel is not a lawyer and frequently presented her case in a haphazard, disjointed fashion. Her examinations of witnesses as well as her own testimony often lacked analytical precision. However, the transcript does not show that Nakasian took it upon himself to put on Rosenstiel's case for her. On a number of occasions, Nakasian did try to clarify what was being said. Pinpointing the essence of a statement or a question is not the same as concocting or recharacterizing it.

An example of this is the first one cited by Fair as evidence of Nakasian's bias. *Tr.* vol. 1, p. 27-28. On page 27, Nakasian states that he wants to clarify for the record that "what [Mr. Fair] did was not in compliance with the lease." Taken out of context, Nakasian appears to be expressing a definite point of view. However, a review of pages 25 to 28 reveals the context of Nakasian's comment and Fair's response to it. Rosenstiel had just concluded her opening, in which she referred to her decision to "lease my farm" to Mr. Fair. *Tr.* vol. 1 at 25. Nakasian noted that "we ought to use the words that are applicable here," and then distinguished the fact that certain acreage, not the entire farm, was leased to Fair. *Id.* at 26. Fair's

counsel, Mr. Wood, agreed with this distinction. Nakasian then noted that without drawing this distinction, it would appear that Fair had access to the whole farm under the lease, when he did not. *Id.* Rosenstiel interrupted at this point to say, "Actually he did because he ruin [sic] everything." *Id.* It is only then, by way of imposing some precision on Rosenstiel and ascertaining the parties' contentions, that Nakasian explained to her that he wanted to clarify her contention for the record, i.e., that what Fair did was not in compliance with the lease, but that she had to make that contention in terms of Mr. Fair's obligations under the lease. *Id.* at 27. Mr. Wood agreed with Nakasian's clarification, adding that Fair had a right to use 750 of 1400 acres. *Id.*

Fair cites other instances of Nakasian's statements as evidence of bias. Rosenstiel sought damages for lost rental income due to Fair's neglect of the farm. She claimed that she was unable to rent her land subsequent to his tenancy. A witness produced by Fair, Mr. Allen Howard, stated on redirect that he was ready to rent the land at Rosenstiel's price but that she would not rent to him. Nakasian sought to clarify this in light of Mr. Howard's earlier statement that he was ready to rent the land under certain conditions, including the repair of fencing and the laying down of seed and that Rosenstiel was unable to meet those conditions. He had also testified that he faced extreme circumstances in needing to settle some cows immediately, suggesting that others in ordinary circumstances might not want to rent the land. Mr. Wood accused Nakasian of arguing Mrs. Rosenstiel's case. *See, Tr.,* vol. 2, pp. 21-28. Ultimately, the panel denied her claim for lost rental income. It is difficult to see how Nakasian's conduct, which was not overtly biased, could have harmed Mr. Fair in this instance.

It is true that Nakasian reacted at times skeptically to Fair's testimony, examinations, and evidence. His skepticism occasionally took the form of sarcastic or exasperated comments, all duly cited by Mr. Fair. Some of Nakasian's comments arguably could have been provoked by Fair referring to Nakasian as "ridiculous." (*Tr.* vol. 3, p. 153). In any event, the root of Nakasian's skepticism apparently was due in part on Fair's failure to produce witnesses other than himself on most of the major issues in the

proceeding. *See*, *Tr.* vol. 3, pp. 150-54. Nakasian appears to have been frustrated by Fair's inability to come up with disinterested evidence and with Fair's use of his dual position as co-counsel, to make comments he otherwise could not make as a party. Rosenstiel, on the other hand, offered several disinterested witnesses and voluminous documentary evidence. Arguably, Nakasian's comments could have served as a prod to Fair to put on evidence through others, to offset the weight of Rosenstiel's evidence. Nakasian did not hide the fact that for him a party's statements, although sworn, should be heavily discounted absent any independent support. It is not necessarily a sign of bias where, after several days of testimony wherein Fair presented his case principally through himself and made extensive use of hearsay, that Nakasian asked or even demanded more than Fair's own statements.

Fair also complains about Nakasian's characterization of Fair as "wild," in response to Fair's calling Mr. Barnes, who was not present at the time, an "animal." *Tr.*, vol. 4, p. 79. The record shows that Nakasian initially chastened Fair in an appropriate manner, noting that it was unfair to cast pejorative remarks at a fellow attorney who was present to defend himself. *Id*. Fair then went on to argue that documents in evidence showed Mr. Barnes to be an animal. Nakasian then responded, "You have characterized a man in the most pejorative terms who is not here to defend himself and it seems to me that you're wild. You're irresponsible to make such a statement. The man [Mr. Barnes] you are talking about is a colleague of your attorney and I think he ought to object." Fair contends that such behavior constituted both partiality and prejudicial misconduct. However, it is also arguable that Fair's behavior in this instance was less than what it should have been.

It is undoubtedly true as Mr. Fair asserts, that:

> Where an arbitrator, though appointed by the party, identifies himself personally with his party and with his party's prejudices and needs, as herein, the conclusion is unavoidable that the arbitrator has lost sight of his duty as an arbitrator and is unable to act as an arbitrator. (Citations omitted). *Brennan v. Stewarts' Pharmacies, Ltd.*, 579 P.2d 673 at 682 (Haw. 1978).

However, I do not agree that Nakasian identified himself personally with Rosenstiel's needs or her prejudices. His comments, while pointed, even sharp, were primarily directed toward serving the arbitrator's interests in making a clear and complete record. The transcript does not reflect that Nakasian ever prohibited Fair from examining witnesses or introducing any evidence. On the contrary, he invited Fair to introduce more evidence to bolster his case. Upon a full review of the transcript, Fair's claim of partiality and misconduct on the part of Nakasian is not supported and is not a ground to vacate the award.

The final matter raised by Fair is that the arbitrators exceeded their authority by awarding Rosenstiel $8,000.00 in damages for lost profits from the sale of hay, under paragraph 22 of the decree of reference. That paragraph refers to Rosenstiel's allegation that she "continues to lose farm rental income because the defendant's damage to the farm renders it presently unsuitable to prospective tenants." *Decree of Reference*, Para. 22. Fair contends that paragraph 22 pertains only to lost income from the rental of real property, and therefore, any award of damages based on lost hay profits exceeds the authority of the arbitrators.

The agreement under which issues are submitted to arbitration constitutes the arbitrators' "charter of authority." *Sydnor Pump & Well Co. v. County School Board*, 182 Va. 156 at 168 (1943). Any award not in conformance with the submission exceeds this authority and is void. *Id.* Upon application of a party, such an award, or the appropriate part thereof, must be vacated. Va. Code Ann., Section 8.01-581.010(3) (1984). In determining whether an award is in conformance with the submission (here, a decree of reference), courts must construe the award "liberally, so as to uphold it, if possible, and all fair presumptions are in its favor, but if the award is outside of the submission, it is invalid." *Sydnor*, 182 Va. at 167.

Fair's evidence that the arbitrators exceeded their authority consists of an affidavit of arbitrator Ronald Woodson introduced at the December 11, 1990, hearing. In the affidavit, Woodson states that the arbitrators referred to an outline submitted by Rosenstiel regarding damages

and awarded the $8,000.00 under paragraph 22 for "lost income on the sale of alfalfa and grass hay." Fair asserts that this award exceeds the arbitrators' authority under paragraph 22, which extended only to lost farm rental income.

It is unclear that an affidavit of an arbitrator made after the award is sufficiently probative or reliable to establish the facts therein asserted. Apart from the affidavit, which is not entirely clear to me, there is evidence in the record to support the award. In the arbitration hearing on August 24, 1990, arbitrator Nakasian seemed to understand income lost due to the inability to sell hay was a component of lost rental income. *Tr.*, vol. 4, pp. 85-86. In response to objections regarding Rosenstiel's presentation of evidence under paragraph 22 concerning lost hay sales and related income, Nakasian specifically states, "farm rental income is directly related to what the farm produces, not to some abstract amount. And what she is trying to prove, I think, is that the farm isn't producing like it used to." *Id.*, p 86.

It is true that in Rosenstiel's outline, attached as Exhibit A to Plaintiff's Exhibit 1, damage figures pertaining to paragraph 22 are collected under the heading "Loss of rental and income for 1990." *Ex. A, Pl. Ex. 1*, at 5. Moreover, the figures which appear are divided between an estimate "on alfalfa and hay" for $14,750.00, and an estimate "on pastures rental" for $3,612.00. *Id.* The latter estimate carries the explanation that it is limited to lost rental income on a specific lease agreement, namely, a "[p]roposed contract from Mr. V. A. Etheridge (not accepted because of the need to repair fences and restoration of pastures & hay fields)." *Id.* It is possible that the arbitrators, looking at these figures, could have interpreted them as a breakdown of total lost rental income, between the loss of a specific lease, and the loss of rental income from all other potential leases routinely based on expected sales of hay. This is particularly plausible when one considers that the specific lost lease pertained to "pastures rental," but not, apparently, to rental of the hay and alfalfa fields.

Mr. Woodson's statement that the $8,000.00 was awarded for loss of income on the sale of alfalfa and hay may thus be correct but also may not be the whole story. If

the arbitrators viewed the lost sale income as a component or basis of rental income, the award would not exceed the scope of authority granted by paragraph 22. Nakasian's statements, and the testimony and references provided to the arbitration committee, suggest that this may have been the case. Whether the arbitrators were mistaken in this finding is beyond the power of this court to decide. *Sydnor*, 182 Va. at 167. (Arbitration awards will not be set aside for arbitrators' mistakes of law or fact that do not thwart intention of arbitrators). Moreover, Fair did not take the opportunity to obtain clarification of the award under Va. Code Ann. § 8.01-581.08. This court is reluctant to order such a clarification *sua sponte*, absent more evidence that the arbitrators exceeded their authority.

Finally, Fair claims that a statement by Rosenstiel shortly after commencement of the arbitration evinces evident partiality and use of undue means to procure the award. According to Fair, Rosenstiel, while attending a social event, stated to a Mr. Walker that she knew that one of the arbitrators was going to vote her way. Such a statement could be a number of things. It could be a party's self-confident judgment, or boast, as to how things were going at the proceedings. However, it would be speculation on my part to find that this statement, standing alone, is sufficient to establish evident partiality or undue means that would support an application for vacatur.

In conclusion, Fair has failed to establish any ground for vacatur of the arbitration award. There is one overriding fact that casts considerable doubt on Fair's claims. It is that not one, but all three of the arbitrators concurred in the arbitration award, including the arbitrator chosen by Fair. This alone is considerable evidence that the arbitrators employed fair procedures to reach a reasoned result. Absent proof of any of the grounds stated in Va. Code Ann., § 8.01-581.010, a court should not undo a result reached through a process agreed to beforehand by the parties. The application to vacate the arbitration award is denied, and the motion to confirm the award is granted.